S00G0417. PAUL v. THE STATE.
(537 SE2d 58)

THOMPSON, Justice.

Larry Marion Paul was convicted of aggravated assault with a deadly weapon and possession of a knife during the commission of certain crimes. The charges stemmed from a fight which took place between Paul and the victim in the parking lot of a bar. Paul appealed, contending, inter alia, that the trial judge erred in expressing an opinion of his guilt in violation of OCGA § 17-8-57.[1]

During the course of the trial, the trial judge took an active role in the proceedings, posing questions to the victim and several witnesses. Trial counsel did not object to the trial judge's questions, nor did he move for a mistrial on the ground that the trial judge erroneously expressed his opinion as to what had or had not been proved. On appeal, new counsel asserted that the trial judge violated OCGA § 17-8-57 and that trial counsel was ineffective for having failed to object. The Court of Appeals affirmed defendant's conviction, finding

---

[1] This Code section provides:

It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give.

that trial counsel's failure to object to the trial judge's questions constituted a waiver of the OCGA § 17-8-57 issue, but that trial counsel did not render ineffective assistance. *Paul v. State*, 240 Ga. App. 699 (524 SE2d 549) (1999). We granted defendant's petition for a writ of certiorari.

1. We have reviewed the trial judge's questions and comments and conclude that he took a prosecutorial role in the trial of the case, and intimated his opinion as to the credibility of witnesses and the guilt of the defendant.

Our conclusion is based on several exchanges between the trial judge and various witnesses. For example, when the victim testified as to his injuries, the trial judge asked whether the victim had any scars that he could show the jury. The victim answered affirmatively, and the trial judge directed him to approach the jury box and show the jury his injuries. Later, when defendant attempted to show that he was disabled, the trial judge discredited him by intimating that he was on the public dole.

Furthermore, the trial judge questioned a State's witness in such a way as to debunk defendant's claim that he left the bar to comply with the bartender's "closing time" announcement, rather than to fight with the victim:

THE COURT: Did anybody announce, "We're closing this place, everybody leave"?
A. No.
THE COURT: No announcement like that before anybody left that you heard?
A. No.
THE COURT: Okay, I just wondered if anybody said, "We're closing, everybody out."
A. They were still open for business.
THE COURT: They were still open for business when these people left out and when you went out the first time?
A. Yes.

Moreover, the trial judge discredited a defense witness by questioning her as follows:

THE COURT: Okay. Nobody hadn't asked you; I don't know why. You know what pool hustlers are, don't you?
A. Yes sir.
THE COURT: Is that what goes on in this place, they have people around there hustling pool or not?
A. No sir.
THE COURT: You're not one?

A. No sir.
THE COURT: You know what I'm talking about?
A. Yes sir.
THE COURT: Take me. I can't shoot too good, so you get in a little bet with me and win all my money. Right?
A. No, I wouldn't do that.

The trial judge went so far as to question an expert defense witness in such a way as to point out that post-traumatic stress disorder, a key component of defendant's psychiatric defense, can be faked:

THE COURT: Is there any way that you can know whether this disorder kicks in at that particular time or whether you could just fake it?
A. Judge, it's possible to fake a lot of things.
THE COURT: Is there any way to know?
A. No sir, I can't be sure, but looking at [defendant's] record, he's had that illness for at least 10-12 years, and he's had similar episodes.

Finally, the trial judge posed these questions about defendant's suicide attempts:

THE COURT: Well, one other thing I might ask, because it's bothering me, and I'm sure if it's bothering me, it's bothering someone on the jury — you say he attempted suicide. How did he attempt suicide? Did he shoot himself? Did he cut himself? Did he take an overdose of pills? Jump off a bridge, or what?
A. I believe on this one, he attempted to shoot himself with a .22 caliber weapon. Typically, he has attempted an overdose . . .
THE COURT: Shoot himself where?
A. That I don't recall, and I don't see it in the discharge summary.
THE COURT: Has he ever shot himself in the head?
A. I've never known him to shoot himself in the head.
THE COURT: Or anything like that, that would kill you that's what I'm asking.
A. Usually he has overdosed on a prescription medication when he had attempted suicide.
THE COURT: And then he walks to the hospital?
A. Sometimes he has been brought by the police, sometimes a friend will bring him. I think on one or two occasions he might have brought himself.

THE COURT: Just walked up himself?

A. Uh . . .

THE COURT: You're the one that . . .

A. My memory is a little vague on that.

THE COURT: . . . knows, but usually I think of people committing suicide, if they are really serious, they shoot themselves, or cut themselves, or something. But maybe this is different. Go ahead.

Arguably, some of the trial judge's questions were aimed at fully developing the truth of the case and fell within the court's discretion. *Eubanks v. State*, 240 Ga. 544, 547 (242 SE2d 41) (1978). However, the trial judge crossed the line when he questioned defendant's experts about post-traumatic stress syndrome and attempted suicide. In each of those instances, the trial judge effectively disparaged defendant's psychiatric defense and intimated that he gave it no credence whatsoever. It follows that the trial judge violated OCGA § 17-8-57. The jury easily could have interpreted the trial judge's remarks as an expression of opinion on the issues to be decided in the case. See *Crane v. State*, 164 Ga. App. 638 (298 SE2d 619) (1982). "Extreme anxiety to develop the truth as to facts which, if proved, will be peculiarly beneficial to one of the parties in the case and correspondingly detrimental to the other can easily be mistaken by the jury for a manifestation of the judge's conviction that one party rather than the other should prevail. [Cits.]" *Nobles v. State*, 13 Ga. App. 710 (1) (79 SE 861) (1913).

2. Although we have found that the trial judge erroneously intimated his opinion in violation of OCGA § 17-8-57, and although we are not authorized to hold the error harmless, *Crane v. State*, supra at 640, we have repeatedly held that such an error is waived in the absence of an objection or a motion for a mistrial. *Cammon v. State*, 269 Ga. 470 (500 SE2d 329) (1998); *Walker v. State*, 258 Ga. 443 (370 SE2d 149) (1988); *Hill v. State*, 237 Ga. 794 (229 SE2d 737) (1976). Because defendant failed to object or move for a mistrial, the trial judge's OCGA § 17-8-57 violation was waived. *Shepherd v. State*, 203 Ga. 635 (47 SE2d 860) (1948); *Simmons v. State*, 181 Ga. 761 (184 SE 291) (1936).

3. This Court has not adopted the plain error rule in cases in which the death penalty is not sought. *Derrick v. State*, 263 Ga. 766 (2) (438 SE2d 903) (1994). But the Court of Appeals has. *Almond v. State*, 180 Ga. App. 475, 480 (349 SE2d 482) (1986). Moreover, this Court has weighed facts against the plain error rule even where it has said that the plain error rule does not apply. See, e.g., *Derrick v. State*, supra; *Owens v. State*, 263 Ga. 99 (2) (428 SE2d 793) (1993). We believe the plain error rule should be applied to cases of this kind.

Accordingly, we will apply the plain error rule to death penalty cases, and other criminal cases in which the trial court violates OCGA § 17-8-57.

Turning to this case, we have no hesitation in concluding that the trial judge's violation of OCGA § 17-8-57 "seriously affect[ed] the fairness, integrity, and public reputation of these judicial proceedings." *Almond v. State*, supra at 480. Therefore, we reverse this case and grant a new trial.

4. In view of our ruling in Division 3, we need not decide whether trial counsel's failure to object or move for a mistrial constituted ineffective assistance.

*Judgment reversed. All the Justices concur.*

CARLEY, Justice, concurring.

I agree generally with the majority opinion and with reversal of the conviction and remand of the case. With regard to Division 2, I believe that where, as here, defendant did not object or move for a mistrial, the cases cited by the majority hold that any violation of OCGA § 17-8-57 by the trial judge will not be considered on appeal. See *Shepherd v. State*, 203 Ga. 635 (47 SE2d 860) (1948); *Simmons v. State*, 181 Ga. 761 (184 SE 291) (1936). Thus, in the absence of the application of a "plain error" analysis, there would not be reversible error in this case. However, I agree with Division 3 wherein this Court now extends the plain error rule to all criminal cases in which there is alleged to be a violation of OCGA § 17-8-57. I also agree with the majority's determination that, upon application of the plain error rule in this case, the judgment of conviction must be reversed.

DECIDED OCTOBER 2, 2000.

*Mark J. Kadish*, for appellant.
*Daniel J. Craig, District Attorney, Charles R. Sheppard, Assistant District Attorney*, for appellee.